IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOE MOORE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:25-cv-00855-RAH |
| | ) | |
| JOHN SHEARON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

## INTRODUCTION

This matter comes before the Court on the *Motions to Dismiss* (doc. 79; doc. 91) filed by Defendants Nic Bolton, Stephen Brock, Ann Davis, Freeman Ellison, Corry McCartney, Adam Moore, Matt Mosley, John Shearon, Darrell Bone, Edwin Freeman, Tanner Glass, Jessica Mims, Michael Ray, and Christopher Whittle. Defendants Michael Bowles, Ashley Gargus, Ken Harmon, Tyler Smitherman, and John Pace later joined and adopted the Chilton County Defendants'[1] motion and brief. (Doc. 113; Doc. 114; Doc. 125; Doc. 128.) Plaintiffs Joe Moore (Joe) and Kristy Moore (Kristy) filed responses in opposition to the motions. (Doc. 86; Doc. 96.) Defendants filed replies. (Doc. 93; Doc. 99.) After careful review of the motions, the briefs filed in support of and in opposition to the motions, and the applicable law, the Court concludes that the Clanton Police Defendants'[2] motion

[1] The Chilton County Defendants are Bolton, Brock, Davis, Ellison, McCartney, Adam Moore, Mosley, Shearon, Bowles, Gargus, Harmon, Tyler Smitherman, and Pace.

[2] The Clanton Police Defendants are Bone, Freeman, Glass, Mims, Ray, and Whittle.

(doc. 91) is due to be granted in part and denied in part, and the Chilton County Defendants' motion (doc. 79) is due to be denied without prejudice.

## BACKGROUND

The following facts come from the First Amended Complaint (FAC) (doc. 70), taken in the light most favorable to Plaintiffs, and from the documents the Court may consider at this stage (*see infra* notes 3, 6).

On October 29, 2023, Joe was involved in a domestic violence incident at the Moores' home in Clanton, Alabama, around noon. (Doc. 70 at 5.) Kristy and the couple's daughter left the house, and the daughter called 911.[3] (*Id.*) The daughter reported that Joe was drunk and had assaulted Kristy. (Doc. 92-1 at 1.) She stated that Joe put his hands on Kristy's neck, brought her to the ground, and said, "'I'm going to kill your momma.'" (*Id.*) In response to the dispatcher's questions, the daughter relayed Kristy's statements that Joe had "that air soft pellet pistol thing" and had been known to be violent with law enforcement in the past. (*Id.* at 2.)

Defendants Mims, Ray, Freeman,[4] Whittle, Bone, and Glass are alleged to be City of Clanton police officers. (Doc. 70 at 4.) The FAC alleges that Mims, Ray,

---

[3] Under the incorporation-by-reference doctrine, a court may consider a document outside the four corners of the complaint when ruling on a Rule 12(b)(6) motion to dismiss if (1) it is central to the plaintiff's claim and (2) its authenticity is not disputed. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The Court may properly consider the certified transcript of the 911 call (doc. 92-1), which the FAC references (doc. 70 at 5) and which prompted the police response central to Plaintiffs' claims. Plaintiffs do not dispute the authenticity of the transcript. (Doc. 96 at 9.) The Court considers the transcript only for what officers were told, not for the truth of the statements it contains. At this stage, the Court does not consider the dashcam footage (doc. 56-1), which Plaintiffs argue bears only on the tackle claim and lacks an affidavit as to the video's authenticity. (Doc. 96 at 8.) *Cf. Swinford v. Santos*, 121 F.4th 179, 187 (11th Cir. 2024) (explaining the centrality prong was met where bodycam footage depicted the complained-of police shooting and surrounding sequence of events), *cert. denied,* 146 S. Ct. 204 (2025).

[4] The FAC mixed up Defendants Freeman Ellison and Edwin Freeman, and the Court subsequently granted Plaintiffs' motion to modify the FAC to correct those errors. (Doc. 95; Doc. 100.) As modified, the FAC alleges that Freeman Ellison is a Chilton County deputy sheriff and a member of the Chilton County Sheriff's Office SWAT Team. (Doc. 70 at 3; Doc. 95 at 1.) Edwin Freeman

Whittle, and Freeman were also members of the SWAT Team described below, and that Bone and Glass participated in Joe's arrest. (*Id.*) Clanton officers responded to the call, spoke with Kristy and the daughter, and made contact with Joe, who refused to come out to be arrested. (*Id.* at 5–6.)

As a result of Joe's refusal to come out, the Chilton County Sheriff's Office SWAT Team[5] was dispatched. (*Id.*) The SWAT Team began arriving after 12:30 p.m. (*Id.* at 6.) According to the FAC, Kristy told officers on the scene that there were no firearms in the house, and all members of the SWAT Team were informed, directly or through other officers, that Joe did not have access to a useable firearm or other dangerous weapon. (*Id.*)

Shortly before 1:00 p.m., a SWAT Team representative contacted Joe and asked him to come out. (*Id.*) The SWAT Team commanders ordered officers to train their weapons on Joe and the house. (*Id.* at 7.) The FAC alleges that each SWAT Team Defendant pointed his or her rifle at Joe. (*Id.*) According to Joe, he refused to exit the house because the SWAT Team members were pointing assault rifles at the front of his house, and he was afraid of being shot. (*Id.* at 6.)

Joe communicated with a SWAT Team representative and did not threaten violence. (*Id.* at 7.) By text, he told Kristy and his daughter that he was afraid the SWAT Team was going to kill him if he came out, and Kristy relayed that fear to officers on the scene. (*Id.*) According to Joe, the SWAT Team commanders, Defendants Brock and McCartney, and Sheriff John Shearon escalated to force Joe from the home out of concern about a large program at a nearby church scheduled

---

is alleged to be a City of Clanton police officer and a member of the SWAT Team. (Doc. 70 at 4; Doc. 95 at 1.)

[5] The SWAT Team consists of Brock and McCartney (the SWAT Team commanders), Adam Moore, Ellison, Harmon, Mosley, Bolton, Bowles, Tyler Smitherman, Gargus, Mims, Ray, Whittle, and Freeman. (Doc. 70 at 3–4.)

for later that day featuring Rick Burgess, an Alabama talk show host and author. (*Id.* at 8.) Before ordering the escalation, Brock and McCartney called Shearon, explained the situation, and obtained his approval. (*Id.* at 10.) The escalation occurred approximately ten minutes after Joe initially told the SWAT Team he would not exit the home. (*Id.* at 11.) The FAC alleges that the escalation came without any warning to Joe and without the use of negotiators. (*Id.* at 8–11.)

The SWAT Team began its forcible intrusion into the Moore home. They cut off the power and surrounded the home. (*Id.* at 11.) Next, members of the SWAT Team shot at least twelve CS/pepper (tear gas) canisters into the home from all sides, shooting out eight windows and the sliding glass door. (*Id.* at 11–12.) The FAC alleges that Adam Moore, Ellison, Harmon, Mosley, Bolton, Bowles, Tyler Smitherman, and Gargus fired the canisters, one of which struck Joe in the head, but it does not identify which of them fired that particular canister. (*Id.* at 8, 11–12.) The FAC alleges that Brock and McCartney gave the order to fire, with Shearon's approval. (*Id.* at 11.) Joe alleges that, after being struck, he could not breathe or see, and his ears were ringing. (*Id.* at 12–13.) He yelled that he was coming out and exited the home as the SWAT Team pointed their rifles at him. (*Id.* at 13.) He complied with law enforcement's requests to put his hands up and to walk backwards toward them. (*Id.*)

As Joe describes it, Bolton then used a "football-style tackle" to bring Joe down to the concrete sidewalk. (*Id.* at 14.) Joe alleges that Bolton struck him "with serious force," causing him to scream in pain. (*Id.*) He was then taken into custody. (*Id.*) The period between the initial call and Joe's arrest appears to have been over an hour. (*Id.* at 6–11.)

Additionally, because of the SWAT Team's tactics, the Moores' power meter was physically damaged, multiple appliances were fried, and eight windows and the back sliding door were broken. (Doc. 70 at 12.) The home was covered in residue

from the tear gas, and the family was unable to return for many months until it was suitable for occupancy again. (*Id.*)

Joe was then taken to the Chilton County Jail. (*Id.* at 14–15.) During booking, Defendant Allen Smitherman antagonized and threatened Joe. (*Id.* at 15.) Then, Defendants Allen Smitherman, Pace, and an unnamed jailer began hitting Joe in his head, face, ribs, and stomach. (*Id.* at 15–16.) Defendants Bone, Glass, and Ray were present and, the FAC alleges, "knew, from prior incidents at the jail and from their observations of Smitherman, what was about to happen," but made no effort to prevent or stop the beating despite an opportunity to do so. (*Id.* at 15.) After the assault, the jailers placed Joe in a restraint chair. (*Id.* at 16.)

Defendant Misty Lechantre, the nurse on duty, approved the use of the restraint chair. (*Id.*) She approved the jailers' orders that Joe not be given any breaks, even to use the restroom. (*Id.*) Joe began experiencing chest pain and asked the officers and Lechantre for help, but all refused. (*Id.* at 16–17.) According to Joe, he had suffered a heart attack and underwent heart surgery less than two months earlier. (*Id.*) He eventually lost consciousness, and Lechantre roused him using smelling salts. (*Id.* at 17.) She did not check his vital signs or otherwise treat or assess his medical condition. (*Id.*) Defendants Bone, Glass, and Ray were present and failed to intervene to help him. (*Id.*) He was kept in the restraint chair for over two hours. (*Id.*)

After he was released from the restraint chair, the officers, with Lechantre's approval, placed Joe on suicide watch in a holding cell. (*Id.* at 18.) He was denied a meal and provided only a suicide gown and a thin mattress. (*Id.*) When Joe tried to lie on the bench, Allen Smitherman would bang on the door and tell him to lie on the floor. (*Id.*) He remained in the holding cell until 11:30 p.m., when an officer on the next shift allowed him to clean up, shower, and have a meal. (*Id.*) He was

eventually sent to the hospital because of his heart condition, injuries, and dangerously high blood pressure. (*Id.* at 18–19.)

Joe later pleaded guilty to misdemeanor third-degree domestic violence and does not dispute that there was probable cause for his arrest. (Doc. 70 at 5.) The state-court record reflects that Joe was sentenced to twelve months in the Chilton County Jail, but his sentence was suspended. *See City of Clanton v. Moore*, No. CC-2024-000235.00, Doc. 44 at 3 (Chilton Cir. Ct., Ala., Sep. 29, 2025).[6]

Joe and Kristy then filed this civil suit against the involved law enforcement officials, alleging eight claims under 42 U.S.C. § 1983 and one claim for medical negligence.[7]

---

[6] "Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) (citing Fed. R. Evid. 201). Judicial notice extends to the existence and contents of the filings, not to the truth of their contents. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). The underlying criminal complaint charged Joe with

> choking, pulling [Kristy's] hair, and throwing her to the ground. . . . The victim stated that when she arrived home from church that she could tell that the offender had been drinking. Mrs. Moore stated that Mr. Moore eventually came at her with a broom while swinging it and also put his hands around her neck and pushed her against the wall. Mrs. Moore stated that he kept telling her that she was going to die. Mrs. Moore stated that one of her children came out of her bedroom and Mr. Moore stated that he was glad she was there so she could see him punch Mrs. Moore in the face. Victim stated that Mr. Moore took his shirt off and ran at her taking her to the floor. The daughter . . . saw this and ran outside of the home screaming. Ms. Moore stated that she was finally able to free herself from Mr. Moore and ran out of the home and got their son who was in the back yard and took him to a neighbor for safety. During this time the daughter . . . had called 911.

*City of Clanton v. Moore*, No. CC-2024-000235.00, Doc. 1 at 4 (Chilton Cir. Ct., Ala., Mar. 4, 2024).

[7] Joe and Kristy jointly bring Counts III and IV (Section 1983 claims alleging Fourth Amendment violations for unlawful pre- and post-arrest entries onto the Moore property). All other counts are brought by Joe only.

Pending before the Court are two motions to dismiss.[8] One was filed by the Clanton Police Defendants (Bone, Freeman, Glass, Mims, Ray, and Whittle) (doc. 91), and the other was filed by individuals from the Chilton County Sheriff's Office (Bolton, Brock, Davis, Ellison, McCartney, Adam Moore, Mosley, and Shearon) (doc. 79). Defendants Bowles, Gargus, Harmon, Tyler Smitherman, and Pace later joined the motion. (Doc. 113; Doc. 114; Doc. 125; Doc. 128.)

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8(a)(2): "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (cleaned up). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555, 570. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Indeed, "[a] pleading that offers 'labels and conclusions' or 'a

[8] Defendants Misty Lechantre, Southern Health Partners, Inc., and Allen Smitherman filed answers to the FAC. (Doc. 83; Doc. 94.)

formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

### A. Clanton Police Defendants' Motion to Dismiss

The Clanton Police Defendants argue that the FAC is a shotgun pleading that fails to allege each Defendant's personal participation, that Plaintiffs have not plausibly alleged any constitutional violations, and that, even if they had, the officers are entitled to qualified immunity.

As a threshold matter, both groups of Defendants argue that the FAC is a shotgun pleading. The Eleventh Circuit has identified four general categories of shotgun pleadings: complaints in which each count adopts the allegations of all preceding counts; complaints replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; complaints that do not separate each cause of action into a different count; and complaints that assert multiple claims against multiple defendants without specifying which defendant is responsible for which acts or omissions. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

The FAC does not fit neatly within any of those categories. Its counts do not adopt one another, and each asserts a theory of liability under a single constitutional provision. Although each count begins "[a]s explained above" and refers to "identified individual defendants"—phrasing the Court's earlier order cautioned against (*see* doc. 68 at 2)—footnotes to each count identify by name the Defendants alleged to have pointed rifles, fired canisters, authorized the force, entered the home, or failed to intervene, and the factual section describes what the SWAT Team

commanders, the canister shooters, the jailers, and the others allegedly did. (*See, e.g.*, Doc. 70 at 10–17, 21–27 & nn. 2–10.) Whatever its shortcomings in form, the FAC gives each Defendant fair notice of the claims against him or her and the grounds on which they rest, which is what *Weiland* requires. 792 F.3d at 1323, 1325. The Court therefore declines to dismiss on shotgun-pleading grounds. And because a plaintiff must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676, the Court addresses personal participation as to each Defendant and claim below.

Qualified immunity protects government officials from suit if (1) they are "performing discretionary functions" and (2) "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an affirmative defense. The "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (cleaned up). To determine whether an officer was performing a discretionary function, courts ask whether the officer was performing a legitimate job-related function through means that were within his power to use. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

Effectuating arrests and responding to emergency calls are clearly discretionary functions of law enforcement officers. *See, e.g.*, *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) ("[M]aking an arrest is within the official responsibilities of a sheriff's deputy . . . ."); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) ("[The officer] was acting within the course and scope of his discretionary authority when he arrested [the plaintiff] and transported her to jail."). The Clanton Police Defendants did just that when they responded to the

domestic violence report at the Moore home and later transported Joe to the Chilton County Jail. Therefore, they have carried their initial burden of showing they acted within the scope of their discretionary authority. Plaintiffs do not argue otherwise.

Once an officer seeking qualified immunity shows that he acted in a discretionary capacity, the burden shifts to the plaintiff to show that the officer is not entitled to qualified immunity. "A plaintiff may rebut this entitlement by showing that the government officials (1) committed a constitutional violation; and (2) that this violation was clearly established in law at the time of the alleged misconduct." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023) (internal quotation marks omitted).

Although "the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). Generally, it is proper to grant a motion to dismiss on qualified-immunity grounds only when the "complaint fails to allege the violation of a clearly established constitutional right." *Id.* (internal quotation marks and citation omitted); *see also Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984) (explaining that an affirmative defense can support a motion to dismiss when the complaint's allegations indicate existence of the defense), *aff'd on reh'g,* 764 F.2d 1400 (11th Cir. 1985) (en banc) (reinstating panel opinion).

Plaintiffs allege six constitutional violations against these Defendants.[9] The Court will address each in turn.

**1. Counts I and II: Excessive Force**

The Clanton Police Defendants move to dismiss Counts I and II. (Doc. 91.) Counts I and II allege that the SWAT Team Defendants, including Mims, Ray,

[9] Plaintiffs withdrew the claim for excessive force related to use of the restraint chair alleged in Count VII of the FAC. (Doc. 86 at 26; Doc. 96 at 14.)

Whittle, and Freeman, deprived Joe of his Fourth Amendment right to be free from excessive force. (Doc. 70 at 21–22.) Count I alleges that these Defendants pointed their rifles at Joe when he was not a threat or failed to intervene to prevent other officers from doing so. (*Id.* at 21 & n.2.) Count II alleges that Mims, Ray, Freeman, and Whittle failed to intervene to stop other Defendants from firing tear gas into the Moore home despite an opportunity to do so. (*Id.* at 11, 22 & n.6.) Plaintiffs now concede, however, that "the Clanton defendants did not fire cannisters or enter the home" (doc. 96 at 13), and the Court accepts that concession as to Counts II and III. Those counts therefore proceed against the Clanton Police Defendants, if at all, only on a failure-to-intervene theory.

The Court begins its qualified immunity analysis by determining whether Joe has identified any constitutional right that the Clanton Police Defendants allegedly violated. The Fourth Amendment governs "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." *Graham v. Connor*, 490 U.S. 386, 388 (1989). To establish a Fourth Amendment claim for excessive force, a plaintiff "must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005). The test for reasonableness is an objective one. *Graham*, 490 U.S. at 397. Courts judge reasonableness "from the perspective of a reasonable officer on the scene" and must keep in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97. "Even if the amount of force used was not necessary, the force is constitutional if it was reasonable." *Pena v. Marcus*, 715 F. App'x 981, 987 (11th Cir. 2017).

No party disputes that Joe was "seized" within the meaning of the Fourth Amendment. Instead, they disagree as to whether the amount of force used was

unreasonable. To determine whether the use of force is objectively unreasonable, courts "measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (cleaned up).

Joe argues that the Clanton Police Defendants used unreasonable force by pointing rifles at him when he was unarmed and posed no threat to the officers. (Doc. 70 at 13–14; Doc. 96 at 9.) For support, Joe cites *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014), and *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011). Neither supports his argument on the facts alleged here.

The claims in *Saunders* bear no relation to the facts alleged here. In *Saunders*, the Eleventh Circuit held that the plaintiff stated an excessive-force claim where an officer "slammed" his head against the pavement with "extreme force" when he was not resisting or attempting to flee. 766 F.3d at 1265–66. Nothing in *Saunders* remotely suggests that officers' mere pointing of a firearm by itself constitutes excessive force.

*Croom* does not support Joe's position either. In *Croom*, the Eleventh Circuit affirmed summary judgment for the officer-defendants on the plaintiff's excessive-force claim. There, the plaintiff was in the front yard of her son's home when officers arrived at the home to execute a search warrant. *Croom*, 645 F.3d at 1245. They arrived with guns drawn and screamed at the plaintiff to get on the ground, but she was unable to quickly comply because she suffered from arthritis. *Id.* An officer then pushed her from a squatting position onto the ground and placed a foot on her back. *Id.* She was held there for up to ten minutes. *Id.* The Eleventh Circuit held that the amount of force exerted by officers was de minimis and therefore not excessive. *Id.* at 1252–53. The court stressed the importance of officers' need to "exercise

unquestioned command of the situation" to minimize the risk of harm to officers and occupants when executing a search warrant. *Id.* (internal quotation marks and citation omitted).

Citing decisions from other circuits, the court noted in a footnote that an officer's "decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force." *Id.* at 1252 n.17 (citing *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him."); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) (affirming denial of qualified immunity for officer who held his gun to the head of a nine-year-old); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc) (denying qualified immunity for officer who held his gun to the head of an infant), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc)).

The Eleventh Circuit has also long recognized that officers may draw their weapons when reasonably necessary to protect themselves or maintain order. *See Courson v. McMillian*, 939 F.2d 1479, 1494–95 & n.26 (11th Cir. 1991) (recognizing that the Eleventh Circuit has "condoned officers' having drawn weapons when approaching and holding individuals for an investigatory stop . . . when reasonably necessary for protecting an officer or maintaining order"). Read together, *Croom* and *Courson* make the reasonableness of pointing a firearm at a person turn on whether the person objectively posed a threat to officers or others. They do not establish that officers may never point a firearm at a suspect who is unarmed. *See Gould v. Guerriero*, No. 24-12818, 2025 WL 1291659, at *3–4 (11th Cir. May 5, 2025) (acknowledging that the Eleventh Circuit clearly established that "drawing a gun on a *compliant and non-threatening bystander* constitutes excessive

force" but holding that an officer who drew her gun on a person who disobeyed several commands at a crime scene where a gun had been reported was entitled to qualified immunity (citation omitted)).

Here, the allegations in the FAC, viewed together with the 911 transcript, do not plausibly establish that Joe "objectively pose[d] no threat to the officer[s]." *Croom*, 645 F.3d at 1252 n.17. Rather, officers were responding to an emergency 911 call from Plaintiffs' daughter who had reported a violent domestic assault and a threat to kill by Joe, who then refused to come out of the home when law enforcement arrived. (Doc. 70 at 5–6; Doc. 92-1 at 1.) Joe does not dispute that there was probable cause for his arrest. (Doc. 70 at 5.) Under these circumstances—a domestic violence suspect who had threatened to kill his wife, who was reported to have been violent with law enforcement in the past, and who remained inside a house that officers could not see into—the Court cannot conclude that the FAC plausibly alleges that officers acted unreasonably by pointing their rifles at Joe during the confrontation.

And even if it did, the Clanton Police Defendants would be entitled to qualified immunity because Plaintiffs have not shown that any such violation was clearly established. A plaintiff may make that showing by pointing to a materially similar decision of the Supreme Court, the Eleventh Circuit, or the supreme court of the state in which the case arose; by showing that a broader, clearly established principle controls the novel facts; or by showing that the conduct so obviously violates the Constitution that prior case law is unnecessary. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).

On this issue, Plaintiffs again cite *Croom* and *Saunders*, neither of which holds that pointing a firearm at a suspect under similar circumstances constitutes excessive force. *Saunders* did not involve a firearm, and *Croom* found no constitutional violation and addressed, in a footnote, an unarmed civilian who "objectively poses

no threat." *Croom*, 645 F.3d at 1252 n.17. And decisions from other circuits, including those quoted in *Newcome v. Hernando County Sheriff's Office*, 645 F. Supp. 3d 1308, 1316 (M.D. Fla. 2022), on which Plaintiffs rely (doc. 96 at 9–11), cannot show that a right was clearly established according to the law in this Circuit. *See Powell*, 25 F.4th at 920.

Even accepting the FAC's allegations that Joe stepped outside shirtless, complied with commands to raise his hands and walk backward, and was obviously unarmed (doc. 70 at 13–14), Plaintiffs identify no judicial decision clearly establishing that officers violate the Fourth Amendment by keeping rifles trained on a domestic violence suspect who has just emerged from a barricaded home and has not been physically secured. And to the extent Count I advances a failure-to-intervene theory as to Mims, Ray, Whittle, and Freeman based on the same events, it fails for the same reasons. Count I is therefore due to be dismissed as to Mims, Ray, Whittle, and Freeman.

Next, as Joe notes, an unreasonable use of tear gas can constitute excessive force. But whether the use of tear gas here was reasonable is a fact-dependent question. Courts generally look to what spurred law enforcement intervention, law enforcement's knowledge of an individual's history, the length of the interaction, and the threat of harm. *See, e.g.*, *Est. of Smith v. Marasco*, 318 F.3d 497, 516–17 (3d Cir. 2003) (holding that a jury should decide the reasonableness of activating a SWAT-type team and its tactics where the officers knew of no history of violence, were responding to a minor complaint, and waited many hours before acting). In *Newcome*, which Joe cites, the plaintiffs alleged that James Newcome took a cellphone from a man he believed was threatening him—under the mistaken belief that the cellphone was a gun—and then returned it upon realizing his error. 645 F. Supp. 3d at 1313–14. Later, although law enforcement did not witness the incident or receive a report from the man, a SWAT team raided Newcome's home, including

shattering windows by launching ten tear gas shells into the residence. *Id.* The Middle District of Florida denied the defendants' motion to dismiss on qualified-immunity grounds because "the use of tactical weapons, such as tear gas cannisters, was unreasonable where police have no real basis to believe they faced the threat of violence and they failed to ascertain whether there were any innocent bystanders in the area they deployed force." *Id.* at 1316.

Where the threat level is higher, use of tear gas or other nonlethal alternatives is more reasonable. In *Yates v. Mack*, for example, a SWAT team used tear gas and flash grenades to try to extract a mentally ill man from his mobile home during a multi-hour standoff, after he had fired a gun while deputies were serving a writ. No. CV 20-00131-KD-B, 2021 WL 5748063, at *4–7 (S.D. Ala. Dec. 2, 2021). The court granted the SWAT team members' motion to dismiss on qualified-immunity grounds. *Id.* at *7.

The circumstances here fall between those in *Newcome* and *Yates*. Law enforcement responded to an emergency 911 call reporting Joe's use of physical violence and threats to kill his wife and himself. As relayed by the daughter, Kristy told authorities that Joe had been known to be violent with law enforcement in the past. The 911 caller reported that Joe had an airsoft pellet pistol, and the FAC alleges that Kristy told officers there were no firearms in the home and that the SWAT Team was told Joe did not have access to a useable firearm.[10] A SWAT Team representative asked Joe to come out, and he refused. The escalation followed

[10] The original complaint alleged that "there were no firearms in the house except for an antique shotgun from the 1800s that did not fire that was [Joe] Moore's great-grandfather's." (Doc. 1 at 5.) The FAC, which is the operative pleading, alleges instead that Joe "did not have access to a useable firearm or other dangerous weapon." (Doc. 70 at 6.) *See Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (noting an amended pleading supersedes the original). The Court does not treat the earlier allegation as a binding admission, and, because it must accept the FAC's allegation at this stage, it does not rely on counsel's statements at the motion hearing (doc. 75 at 21) or on bystander statements in the dashcam footage about a shotgun (*see* doc. 56-1).

roughly ten minutes later. Plaintiffs allege that the SWAT Team gave no warning, did not use negotiators, and fired canisters at head level, one of which struck Joe, and they further contend that officers could simply have entered through the rear sliding glass door and taken him into custody. (Doc. 70 at 8–12.) Even if law enforcement could have extracted Joe by other means, that is not the test. *See Menuel v. City of Atlanta*, 25 F.3d 990, 996–97 (11th Cir. 1994) ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable." (citation omitted)). Those allegations may bear on whether the deployment was reasonable, but the Court need not decide that question as to the Clanton Police Defendants because, as explained below, they are entitled to qualified immunity on the only theory pleaded against them. Furthermore, as noted, Plaintiffs concede that the Clanton Police Defendants did not fire any canisters. (Doc. 96 at 13.)

That leaves Plaintiffs' theory that Mims, Ray, Whittle, and Freeman are liable under Counts II and III for failing to intervene. An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's excessive force can be held liable for his nonfeasance. *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007). But the officer must have been "in a position to intervene yet failed to do so," *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008), and "there also must be an underlying constitutional violation," *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). The FAC alleges that the SWAT Team commanders, Brock and McCartney, ordered the deployment with Sheriff Shearon's approval, and that it began about ten minutes after Joe first refused to come out. (Doc. 70 at 10–11.) As to Mims, Ray, Whittle, and Freeman, the FAC alleges only that all SWAT Team members were in constant radio contact, were aware of the order, and "had an opportunity to intervene . . . but refused to act." (*Id.*)

Even assuming that those allegations plausibly show both an underlying violation and an opportunity to intervene, the Clanton Police Defendants are entitled to qualified immunity on this theory because Plaintiffs have not shown that it was clearly established that they were obliged to intervene. Plaintiffs identify no decision of the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court holding that officers violate the Fourth Amendment by deploying tear gas into a home to extract a domestic violence suspect who has refused to come out, much less one that would have put a line member of a SWAT team on notice that he must stop a deployment ordered by the team's commanders and approved by the Sheriff. The decisions Plaintiffs invoke through *Newcome* come from other circuits, and they cannot clearly establish the law here. *Powell*, 25 F.4th at 920.

Plaintiffs' argument that firing the canisters constituted deadly force fares no better. They cite no authority that addresses the use of tear gas canisters under these circumstances, and the deadly-force decisions they do cite—*Tennessee v. Garner*, 471 U.S. 1 (1985); *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003); and *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016)—involved firearms. And *Nute v. White*, 152 F.4th 1311 (11th Cir. 2025), on which Plaintiffs rely for the proposition that "[a]t a minimum, defendants were required to say something" (doc. 96 at 13), involved an arresting officer who watched jailers beat a helpless arrestee. It did not address a coordinated tactical operation directed by a team's commanders, and so does not clearly establish that Mims, Ray, Whittle, or Freeman had a duty to interrupt one.

Counts I and II are therefore due to be dismissed as to Mims, Ray, Whittle, and Freeman on qualified-immunity grounds.

**2. Count III: Unlawful Pre-Arrest Entry**

Mims, Ray, Freeman, and Whittle also move to dismiss Count III, which alleges that the SWAT Team Defendants, without a warrant or exigent

circumstances, entered onto the Moores' property and damaged their home by shooting canisters into it and damaging the power meter, authorized that conduct, or failed to intervene to prevent it.[11] (Doc. 70 at 23 & nn.7–9.) As discussed above, Count III proceeds against the Clanton Police Defendants, if at all, only on a failure-to-intervene theory. (Doc. 96 at 13.)

Plaintiffs must plausibly allege a constitutional violation to overcome qualified immunity. The Fourth Amendment protects against warrantless searches and seizures in the home, which are presumptively unreasonable. *See United States v. U.S. Dist. Ct. for E.D. Mich.*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed."). It is undisputed that law enforcement did not have a warrant to enter Plaintiffs' property. Defendants, however, argue that the exigent circumstances exception to the warrant requirement permitted their entry.

The exigent circumstances exception recognizes that a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). Exigent circumstances must be evaluated objectively based on the totality of the circumstances. *Hill v. Orange Cnty. Sheriff*, 666 F. App'x 836, 839 (11th Cir. 2016). The exception encompasses several common situations where resorting to a magistrate for a search warrant is not feasible or advisable, including danger of flight or escape; loss or destruction of evidence; risk of harm to an individual, the public, or the police; mobility of a vehicle; and hot pursuit. *See Minnesota v. Olson*, 495 U.S. 91, 100–01 (1990) (recognizing that warrantless entry

---

[11] Plaintiffs label Counts III and IV as claims for "unlawful searches." (Doc. 70 at 23–24.) Both sides analyze the claims as challenges to entries that are justified only by consent, a warrant, or probable cause plus exigent circumstances, and the Court does the same. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

may be justified by hot pursuit, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or others, and that, absent hot pursuit, there must be probable cause to believe such a factor is present, with the gravity of the crime and the likelihood that the suspect is armed to be considered); *United States v. Reid*, 69 F.3d 1109, 1113–14 (11th Cir. 1995) (upholding warrantless entry into residence under the exigent circumstances exception). In the criminal or investigatory context, an officer must have probable cause to believe that exigent circumstances exist, *Smith v. LePage*, 834 F.3d 1285, 1293 (11th Cir. 2016), and the reasonableness of that belief is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences," *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (cleaned up).

The Clanton Police Defendants are entitled to qualified immunity on Count III's claim that the pre-arrest intrusion onto Plaintiffs' property was unlawful. Law enforcement received an emergency 911 call from the Moores' daughter that Joe was drunk and violent. When law enforcement arrived at the Moore home, Joe refused to come out. The caller reported that Joe had threatened to kill his wife, had an airsoft pistol, and had been violent with law enforcement in the past. At that point, Joe was refusing to submit to arrest while inside a house that officers could not see into. A reasonable officer could have believed that Joe was an immediate danger to himself, the officers, or others, and the officers therefore had at least arguable probable cause and exigent circumstances to enter onto the property. "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). *See also Harrison v. Davidson Hotel Co.*, 806 F. App'x 684, 687–88 (11th Cir. 2020) (holding that exigent

circumstances justifying entry include a reasonable belief that an individual is a danger to himself). Plaintiffs acknowledge that Joe's safety could, "theoretically," have been a basis for entering the home to take him into custody, though they contend that is not what happened. (Doc. 96 at 17–18.) Thus, at a minimum, a reasonable officer could have believed that exigent circumstances justified the SWAT Team's intrusion onto the property.

To the extent Count III also challenges the manner of the intrusion and the resulting damage to the Moores' home, the Fourth Amendment asks whether the destruction was reasonable. *United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful . . . ."). But the Clanton Police Defendants are alleged only to have failed to intervene in that conduct (doc. 70 at 23; doc. 96 at 13), and, for the reasons stated above with respect to Count II, Plaintiffs have not shown that it was clearly established that they were obliged to stop it. The Court expresses no view as to whether the SWAT Team's deployment of canisters and the resulting damage to the Moores' property were reasonable as to the Defendants who ordered or carried it out.

The Court recognizes that the FAC alleges that "[n]o member of the SWAT Team believed that [Joe] was a danger of killing himself or a danger to them," that "no action of the SWAT Team was based on any concern for [Joe's] health and safety or the health and safety of any other person," and that the SWAT Team commanders and the Sheriff instead escalated out of concern about a church event scheduled for later that day. (Doc. 70 at 7–8.) "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002). But the Court need not resolve what any SWAT Team member subjectively believed or intended because the exigency inquiry is objective. "An

action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Brigham City*, 547 U.S. at 404 (cleaned up). The question is whether a reasonable officer, knowing what these officers knew and had been told, could have believed that exigent circumstances existed. On that question, the nature and substance of the 911 report and Joe's refusal to come out, which the FAC itself alleges, support at least arguable exigency.[12]

Accordingly, Count III is due to be dismissed as to Defendants Mims, Ray, Freeman, and Whittle on qualified-immunity grounds.

**3. Count IV: Unlawful Post-Arrest Entry**

The Court reaches a different conclusion as to Count IV. Defendants Mims, Ray, and Freeman move to dismiss Count IV. Unlike Count III, Count IV alleges that these Defendants unlawfully entered Plaintiffs' house *after* Joe was arrested outside the residence, thereby violating Joe's and Kristy's Fourth Amendment right to be free from unlawful searches. (Doc. 70 at 23–24 & n.10.)

At the time of the officers' entry into the Moores' house, it was clearly established law that, absent probable cause and exigent circumstances, a warrantless entry of a residence violates the Fourth Amendment. "[I]t [is] well-established as 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Hartsfield v. Lemacks*, 50 F.3d 950, 954 (11th Cir. 1995) (cleaned up) (quoting *Payton v. New York*, 445 U.S. 573,

[12] The Court does not rely on the dashcam footage for this conclusion. Plaintiffs object to its consideration (doc. 96 at 8–9), and the bystander statements on which Defendants focus (doc. 99 at 6–7) are not shown to have been communicated to the SWAT Team before it escalated. *Cf. Baker v. City of Madison*, 67 F.4th 1268, 1277–78 (11th Cir. 2023) (explaining that, on a motion to dismiss, courts "accept [a] video's depiction instead of the complaint's account" if the "video is clear and obviously contradicts the plaintiff's alleged facts" because "courts are not required to rely on visible fiction" (internal quotation marks omitted)).

586 (1980)); *see also Kirk*, 536 U.S. at 638 ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."); *Almond v. Randolph Cnty.*, 626 F. Supp. 3d 1218, 1233 (M.D. Ala. 2022).

Under the exigent circumstances exception, officers may perform a warrantless search of the premises, but the search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978). In other words, an officer who enters a home under the exigent circumstances exception may not search beyond the scope justified by the exigency without first obtaining a warrant. *See United States v. Parr*, 716 F.2d 796, 813 (11th Cir. 1983).

As alleged in the FAC, once the officers detained Joe, any exigent circumstances dissipated, at least as to Joe. Joe exited the home, and Defendant Bolton tackled him to the ground, after which he was taken into custody. At that point, any arguable exigent circumstances related to Joe's and law enforcement's safety no longer existed. At this stage, the FAC allegations do not support a need to enter the home to search for additional perpetrators, identify other victims in need of medical assistance, or prevent further violence from occurring inside the house. (Doc. 70 at 5; Doc. 92-1.) *Cf. Holloway*, 290 F.3d at 1338 (holding entry of dwelling permissible where the information conveyed by 911 call and observations of officers led them to believe there could be victims in the home).

Nor does the entry, when confined to the FAC allegations, constitute a protective sweep. *See Maryland v. Buie*, 494 U.S. 325, 334 (1990). Incident to an arrest, officers may, without probable cause or reasonable suspicion, look in spaces immediately adjoining the place of arrest from which an attack could be launched, but a sweep beyond those spaces requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* In this case, the arrest was made in the front yard,

not in the home, as in *Buie*. Notwithstanding the location of the arrest, nothing in the pleadings suggests that the Defendants believed anyone else was in the home or that there was an exigent need to enter.[13]

The Clanton Police Defendants argue that Count IV fails because the FAC alleges no wrongful act inside the home and no specific damages from the entry. That argument misapprehends the claim. The Fourth Amendment violation alleged is the warrantless entry itself, not what officers did once inside. *See Payton*, 445 U.S. at 585–86. The FAC alleges that Mims, Ray, and Freeman, among others, entered the home after Joe was in custody and that the Moores suffered emotional injuries as a result. (Doc. 70 at 14, 24.) Nor does Plaintiffs' counsel's statement at the February 26, 2026, hearing that officers could enter "if . . . they were concerned for his safety" (doc. 75 at 22) change the analysis. (*See* Doc. 92 at 9; Doc. 99 at 7.) Plaintiffs' position is that the FAC alleges no such concern, and the question is whether exigent circumstances existed when the post-arrest entry occurred.

Resolving all doubts in Plaintiffs' favor at the pleading stage, the Court concludes that the FAC sufficiently pleads a Fourth Amendment violation for the post-arrest entry against Mims, Ray, and Freeman that overcomes qualified immunity at this stage.

**4. Count VI: Failure to Intervene**

Defendants Bone, Glass, and Ray move to dismiss Count VI. Joe alleges that, after he was transported to the Chilton County Jail, Allen Smitherman, Pace, and an unnamed jailer assaulted and battered him by repeatedly punching him in the head, face, ribs, and stomach. Joe alleges that as the assault was occurring, Bone, Glass,

[13] A more developed record at the dispositive motion stage may reveal law enforcement's need to enter the home, and the Court can think of many reasons to do so, but the FAC, as currently pleaded, does not answer that question.

and Ray witnessed it but made no effort to stop the beating despite having an opportunity to do so.

An officer may be liable for failing to intervene when another officer uses excessive force. *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000). "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). Importantly, however, liability arises only when "the officer is in a position to intervene and fails to do so." *Priester*, 208 F.3d at 924. That is, the officer must observe his fellow officer's alleged abuse and have some opportunity to intervene. *Ensley v. Soper*, 142 F.3d 1402, 1408 (11th Cir. 1998).

Bone, Glass, and Ray argue that Joe fails to state a claim for failure to intervene because he does not allege that there was "any warning, signal, or time period sufficient to have provided [them] with a realistic opportunity to intervene." (Doc. 92 at 7.) Additionally, they argue that they could not intervene because Bone, Glass, and Ray were not members of the Chilton County Sheriff's Office and had no authority over the jail, its personnel, or its operations. Neither argument is persuasive.

Viewing the allegations in the light most favorable to Joe, the Court concludes that the FAC adequately pleads a failure-to-intervene claim against Defendants Bone, Glass, and Ray. The FAC alleges that Bone, Glass, and Ray were present and personally observed Allen Smitherman and Pace beating Joe in the booking area, where Joe had earlier been cuffed to a bar. The FAC alleges that Joe was repeatedly punched in the head, face, ribs, and stomach and that, when he tried to cover himself, someone pulled his arms down. It further alleges that Bone, Glass, and Ray "knew, from prior incidents at the jail and from their observations of Smitherman, what was

about to happen," yet made no effort to prevent the beating or to stop it once it started despite an opportunity to do so. (Doc. 70 at 15.)

The FAC plausibly pleads that Bone, Glass, and Ray had an opportunity to intervene. Though the precise timeframe of the assault is not pleaded in the FAC, the alleged facts evidence an assault that lasted more than a few seconds—long enough for three jailers to join in succession, for Joe to try to shield himself from the blows, and for the jailers to slam him to the floor and press their weight on him. (*Id.* at 15–16.) *See Detris v. Coats*, 523 F. App'x 612, 616–17 (11th Cir. 2013) (holding that plaintiff pleaded a plausible failure-to-intervene claim where he alleged he was pinned to the floor and then beaten, so the other officers could have intervened or told the attackers to stop).

At this stage, these allegations are sufficient to plausibly demonstrate that the onlooking Defendants had an opportunity to intervene and stop the assault. *Contrast Priester*, 208 F.3d at 925 (holding that a two-minute assault was sufficient to show an opportunity to intervene), *with Brown v. City of Huntsville*, 608 F.3d 724, 730–31, 740 n.25 (11th Cir. 2010) (affirming qualified immunity for an officer who stood nearby while another officer used pepper spray for half a second to three seconds, because the events happened too quickly for him to intervene). Moreover, that Bone, Glass, and Ray lacked supervisory authority over employees of the Chilton County Jail does not preclude liability for their failure to intervene. *Nute*, 152 F.4th at 1319–20 (rejecting argument that officer-defendant did not have authority over employees of different governmental unit). Under these circumstances, Joe adequately alleges that Defendants had a duty "to at least *say something* in an attempt to stop a clear and continuing use of excessive force on a helpless arrestee." *Id.* at 1321. *See also Heflin v. Miami-Dade Cnty.*, 393 F. App'x 658, 660 (11th Cir. 2010) (holding that allegations that officers witnessed the assault, had the chance to intervene, and failed to do so were sufficient at the pleading stage).

Joe has also carried his burden of showing that the right at issue was clearly established. As the Eleventh Circuit has stated, it is clearly established that an officer's failure to intervene to prevent an unprovoked beating is a constitutional violation, and such failure can create direct liability under Section 1983. *Nute*, 152 F.4th at 1319–20 (discussing *Byrd*). Accordingly, the motion to dismiss Count VI filed by Bone, Glass, and Ray is due to be denied.

**5. Count VIII: Deliberate Indifference**

Bone, Glass, and Ray also move to dismiss Count VIII. Joe alleges that these Defendants were deliberately indifferent to his medical condition after he was placed in a restraint chair at the Chilton County Jail. The pleading is extremely convoluted regarding who did or did not do what at the jail.[14] The FAC alleges that Allen Smitherman, Pace, and one of the two Doe jailers assaulted Joe in the booking area, where he had been cuffed to a bar, in the presence of Defendants Bone, Glass, and Ray. (Doc. 70 at 15–16.) The "three jailers slammed [Joe] Moore to the floor." (*Id.* at 16.) Joe alleges that "[t]he jailers [then] got off of [Joe] Moore and dragged [Joe] Moore out of the cell and placed him in a restraint chair." (*Id.*) The FAC then begins referring to Allen Smitherman, Pace, and the unnamed jailer as "the officers," as in "Lechantre approved the officers' use of the restraint chair." (*Id.*) The FAC further alleges that "all four" (i.e., the three jailers or officers—Allen Smitherman, Pace, and the unnamed jailer—along with Lechantre) observed Joe but refused to help as he begged them for assistance. (*Id.* at 16–17.) After Joe allegedly passed out, it was these four who "could see that [he] was not conscious" and whom Joe begged to help after regaining consciousness. (*Id.* at 17.) Allen Smitherman, Pace, the unnamed

[14] The FAC's use of undifferentiated terms such as "the jailers," "the officers," and "all four" makes it difficult to determine who allegedly did what at the jail. In light of the FAC's separate allegation about Bone, Glass, and Ray (doc. 70 at 17), the Court reads them to refer to the three jailers—Allen Smitherman, Pace, and the Doe jailer—and Lechantre.

jailer, and Lechantre eventually left Joe. (*Id.*) The FAC's sole allegation as to Bone, Glass, and Ray at this point is that they "were also present and failed to intervene despite an opportunity to do so." (*Id.*)

To state a claim for deliberate indifference under the Fourteenth Amendment, the plaintiff bears the burden of alleging "(1) that he had an objectively 'serious medical need,' (2) that [the defendant] acted with subjective 'deliberate indifference to [that] serious medical need,' and (3) that he suffered an 'injury . . . caused by [the defendant's] wrongful conduct.'" *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1188 (11th Cir. 2020) (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (internal quotation marks and citation omitted), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm," *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (internal quotation marks and citation omitted). Deliberate indifference means acting with "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc). To meet the deliberate indifference standard, a plaintiff must show that the "defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Id.* at 1262.

Bone, Glass, and Ray argue that Joe failed to state a claim for deliberate indifference to a serious medical need because he does not allege that they had subjective knowledge of Joe's allegedly serious medical needs. They also argue that, regardless of what they saw, they were not responsible for Joe's medical care because they turned him over to the jailers. The Court agrees with the first argument and does not reach the second.

Even assuming Joe had an objectively serious medical need (the first requirement), none of the pleaded facts indicate that Bone, Glass, and Ray were subjectively aware of that need such that they could disregard the risk of harm by not acting. The FAC states that Lechantre, Allen Smitherman, Pace, and the unnamed jailer ignored Joe's pleas and saw that he was unconscious. But Bone, Glass, and Ray were merely "present and failed to intervene." (Doc. 70 at 17.) Beyond that conclusory allegation, the pleadings contain no indication that these Defendants were aware of Joe's unconsciousness or his alleged medical conditions.[15] Despite the failure-to-intervene language, Count VIII is pleaded against these Defendants as a direct deliberate indifference claim. To the extent Joe brings a claim against Bone, Glass, and Ray for failing to intervene to prevent other defendants' alleged deliberate indifference, the claim fails for the same reason: Bone, Glass, and Ray could not have intervened where there is no allegation that they were aware of the alleged deliberate indifference. Thus, Joe's deliberate indifference claim against Bone, Glass, and Ray is due to be dismissed for failure to state a claim.

**B. Chilton County Defendants' Motion to Dismiss**

The other motion to dismiss was filed by SWAT Team members Stephen Brock, Corry McCartney, Matt Mosley, Adam Moore, Nic Bolton, and Freeman Ellison, along with Chilton County Sheriff John Shearon and Ann Davis, the head of the Chilton County Jail. (Doc. 79.) Michael Bowles, Ashley Gargus, Ken Harmon, Tyler Smitherman, and John Pace later joined the motion. (Doc. 113; Doc. 114; Doc.

---

[15] The FAC states: "Shortly after being placed in the restraint chair, [Joe] Moore, who had recently (less than 2 months before) had a heart attack and heart surgery, began having chest pain and begged for the officers [i.e., Pace, Allen Smitherman, and the unnamed jailer] and Lechantre for help." (Doc. 70 at 16–17.)

125; Doc. 128.) The motion is due to be summarily denied for failure to provide sufficient legal and factual argument in support of the motion.

On a motion to dismiss for failure to state a claim, the moving party bears the burden to demonstrate the insufficiency of the complaint's allegations. Fed. R. Civ. P. 7(b)(1)(B) (a motion must "state with particularity the grounds for seeking the order"); Fed. R. Civ. P. 12(b)(6); *see also Lowe v. Metabolife Int'l, Inc.*, 206 F. Supp. 2d 1195, 1202 (S.D. Ala. 2002) (finding that defendant's motion to dismiss "fails because [he] has failed to carry [his] burden of showing why the claims ought to be dismissed"); *Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1279 (S.D. Fla. 2020); *cf. Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (explaining, in the appellate context, that a party abandons a claim when he "makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority"). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it . . . . Rather, the onus is upon the parties to formulate arguments . . . ." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (citation omitted).

The Chilton County Defendants' arguments in support of their motion are inadequate to meet their burden at this stage. In support of their motion, the Chilton County Defendants primarily rely on their general statement that the FAC fails to allege personal participation by any of the named Defendants. Although their brief cites general authority on shotgun pleadings and personal participation, it does not apply that authority to any specific allegation in the FAC or explain which claim fails as to which Defendant.

Indeed, contrary to what the Chilton County Defendants argue, the FAC does contain specific allegations of personal participation. For example, the FAC alleges that Defendant Bolton "struck [Joe] Moore with serious force" and used a "football-style tackle to take [him] violently to the concrete sidewalk." (Doc. 70 at 14.) It also

alleges that Defendants Brock and McCartney gave the order to fire tear gas canisters into the home, that Sheriff Shearon approved the order, and that Defendants Adam Moore, Harmon, Mosley, Bolton, Bowles, Ellison, Tyler Smitherman, and Gargus fired the canisters. (*Id.* at 10–11.) The FAC further alleges that Defendant Pace assaulted Joe at the jail (*id.* at 15–16) and that Defendant Davis was informed of Joe's situation during his first hour in the restraint chair and later reviewed the video of the incident but took no action (*id.* at 17, 20). Each moving Defendant is specifically named at least once, and these Defendants do not meaningfully explain why these allegations are insufficient to state a claim.

Further, the Chilton County Defendants summarily argue that they are entitled to qualified immunity because Plaintiffs failed to plead facts showing that each Defendant's conduct violated clearly established law. (Doc. 80 at 7–8.) A "single, passing reference" to a ground for relief that is "unaccompanied by any discussion or elaboration" is insufficient to preserve it. *Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014); *see also Burt v. City of Pleasant Grove*, No. 2:20-CV-01973-ACA, 2021 WL 4171346, at *13 (N.D. Ala. Sep. 14, 2021) (refusing to consider perfunctory qualified immunity argument). Therefore, the Court will not consider the argument, particularly because it recycles the same general argument that the FAC lacks specifically pleaded allegations as to individual Defendants. Accordingly, the *Motion to Dismiss* (doc. 79) is due to be denied without prejudice. The Chilton County Defendants may renew their arguments at a later date with fully developed briefing.

## CONCLUSION

For the reasons stated, it is **ORDERED** as follows:

(1) The *Motion to Dismiss* (doc. 79) filed by Defendants Nic Bolton, Stephen Brock, Ann Davis, Freeman Ellison, Corry McCartney, Adam Moore, Matt

Mosley, John Shearon, Michael Bowles, Ashley Gargus, Ken Harmon, Tyler Smitherman, and John Pace is **DENIED WITHOUT PREJUDICE**;

(2) The *Motion to Dismiss* (doc. 91) filed by Defendants Jessica Mims, Michael Ray, Edwin Freeman, Christopher Whittle, Darrell Bone, and Tanner Glass is **GRANTED** as to Counts I, II, and III as to Defendants Mims, Ray, Freeman, and Whittle and as to Count VIII as to Defendants Bone, Glass, and Ray, and therefore Counts I, II, and III are **DISMISSED WITH PREJUDICE** and Count VIII is **DISMISSED WITHOUT PREJUDICE** as to those Defendants;

(3) The *Motion to Dismiss* (doc. 91) filed by Defendants Jessica Mims, Michael Ray, Edwin Freeman, Christopher Whittle, Darrell Bone, and Tanner Glass is **DENIED** as to Count IV as to Defendants Mims, Ray, and Freeman and as to Count VI as to Defendants Bone, Glass, and Ray;

(4) Count VII is **DISMISSED WITHOUT PREJUDICE** as to all Defendants based on Plaintiffs' concession (doc. 86 at 26; doc. 96 at 14);

(5) The Clerk of Court is **DIRECTED** to terminate Defendant Christopher Whittle from this action; and,

(6) The following claims remain pending:

a. Counts I (excessive force for pointing firearms at Plaintiff Joe Moore), II (excessive force for use of the tear gas), and III (unlawful entry before the arrest) against Adam Moore, Freeman Ellison, Ken Harmon, Matt Mosley, Nic Bolton, Michael Bowles, Tyler Smitherman, Ashley Gargus, Stephen Brock, Corry McCartney, and John Shearon;

b. Count IV (unlawful entry after the arrest) against Adam Moore, Freeman Ellison, Ken Harmon, Matt Mosley, Nic Bolton, Michael Bowles, Tyler Smitherman, Ashley Gargus, Jessica Mims, Edwin Freeman, and Michael Ray (and, to the extent

they are alleged to have authorized the entry, Stephen Brock, Corry McCartney, and John Shearon);

c. Count V (excessive force for the tackle) against Nic Bolton and John Shearon;

d. Count VI (excessive force for the beating and failure to intervene) against Allen Smitherman, Jailer Doe #1 & #2, John Pace, Michael Ray, Darrell Bone, Tanner Glass, Ann Davis, and John Shearon;

e. Count VIII (deliberate indifference to a serious medical need) against Allen Smitherman, Jailer Doe #1 & #2, John Pace, Misty Lechantre, Ann Davis, and John Shearon; and,

f. Count IX (medical negligence) against Misty Lechantre and Southern Health Partners, Inc.

**DONE** and **ORDERED** on this the 25th day of November 2026.

R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE